UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


ANTHONY O'BRIEN,

      Plaintiff,

v.                           Lead Case No. 2:12-cv-5138
                           Consolidated Case No. 2:12-cv-5262


QUICKEN LOANS, INC. and
BANK OF AMERICA, N.A.,

      Defendants.


<u>MEMORANDUM OPINION & ORDER</u>

      Pending is the motion to dismiss by defendant Quicken

Loans Inc. ("Quicken"), filed October 8, 2012.  Also pending is the

motion to dismiss by Bank of America, N.A. ("Bank of America"),

filed October 9, 2012.


I. Background

      This case arises from allegedly predatory loans by

Quicken to plaintiff Anthony O'Brien.  The allegations of fact set

forth in the first amended complaint (the "complaint") are as

follows.  O'Brien resides in St. Albans, West Virginia at the home

that secures the loans at issue.  Compl. ¶ 2.  He resides with and

supports his mother and claims to be unsophisticated in financial

matters.  <u>Id.</u>  Quicken is a corporation with a principal place of business in Livona, Michigan.  <u>Id.</u> ¶ 3.  Bank of America is a corporation with a principal place of business in Charlotte, North Carolina.  <u>Id.</u> ¶ 5.

A. Loan Origination

O'Brien purchased his home with his wife for $87,000 in 2003.  <u>Id.</u> ¶ 7.  In 2008, they divorced, and his ex-wife quitclaimed the home to him.  <u>Id.</u> ¶ 8.  Sometime thereafter, around 2008, O'Brien responded to a solicitation by Quicken to refinance his home mortgage.  <u>Id.</u> ¶ 9.  He informed Quicken that his purpose in refinancing was to remove his ex-wife's name from the financing. <u>Id.</u> ¶ 10.

All communications during the application process took place over the telephone, except for an "electronic signing" that Quicken instructed O'Brien to complete.  <u>Id.</u> ¶ 11.  No one was present to explain the documents.  <u>Id.</u>  Quicken informed O'Brien that it would send an appraiser to his home.  <u>Id.</u> ¶ 12.  On a date unspecified in the complaint, an appraiser visited O'Brien's home. <u>Id.</u> ¶ 13.  After approximately fifteen minutes, the appraiser instructed O'Brien to paint his garage and back porch and said that he would return once the painting was completed, which he did.  <u>Id.</u>

Quicken informed O'Brien that the home had appraised for more than the loan amount, that the loan was approved, and that

someone would contact him to close the loan.  Id. ¶ 14.  Thereafter Quicken's closing agent, Marshall S. Crowder, Jr., contacted O'Brien and instructed him to come to a McDonald's Restaurant at lunch time on August 22, 2008 to close the loan.  Id. ¶ 4, 15. During the closing, which took approximately fifteen minutes, Crowder was eating lunch and the restaurant was crowded with other customers.  Id.  O'Brien alleges that Crowder did not explain the loan documents or provide O'Brien with an opportunity to fully review the loan documents.  Id.  He further alleges that the circumstances of the closing made him uncomfortable discussing private financial information and made it difficult for him to ask questions about the loan.  Id.  O'Brien was not provided a copy of the signed documents from the closing.  Id. ¶ 16.  He was given a copy of the appraisal, which valued the home at $147,000.  Id. ¶ 17.

The loan had an initial principal balance of $139,080.00. Id. ¶ 18.  It had settlement charges of over $9,000.00 as well as $3,069.58 in cash out that O'Brien had not requested.[1]  Id.  The loan also contained a requirement of compliance with the regulations of the Secretary of Housing and Urban Development ("HUD") for loans guaranteed by the Federal Housing Administration ("FHA") in the event of borrower default.  Id.

---

[1] The complaint does not specify to whom the cash out was paid or whether the cash out and the settlement charges are included in the stated $139,080.00 principal balance.

3

Approximately five months later, around May 2009, Quicken solicited O'Brien to refinance his loan with Quicken. Id. ¶ 20. Quicken arranged for a second appraisal of O'Brien's home. Id. ¶ 21. It then advised O'Brien that he was approved for the loan based on the value of his original 2008 appraisal, which Quicken indicated was more accurate than the second appraisal. Id. ¶ 22.

The second loan closed on June 22, 2009, again at McDonald's during lunch time at Crowder's request. Id. ¶¶ 23-24. As with the first closing, Crowder was eating lunch and the restaurant was crowded with other customers. Id. ¶ 24. O'Brien alleges that Crowder again failed to explain the loan documents and did not provide him with an opportunity to fully review the loan documents. Id. ¶ 25. He repeats his allegation as to feeling uncomfortable discussing financial information and asking questions about the loan. Id. ¶ 26.

The 2009 loan had an initial principal balance of $140,323.00. Id. ¶ 27. It had "additional" fees of $4,997.43 and a requirement that O'Brien pay Quicken $1,003.53 of his own funds to close the loan.[2] Id. Like the 2008 loan, it contained a requirement of compliance with the regulations of the Secretary of

_____

[2] Again, it is unclear from the complaint whether the fees are included in the principal balance. Also, O'Brien does not state the outstanding balance on the 2008 loan at the time of the 2009 refinancing.

HUD for loans guaranteed by the FHA in the event of borrower
default.  Id.

O'Brien states that as a result of these transactions he
paid over $14,000 in settlement charges over the course of six
months.  Id. ¶ 28.  By letter dated February 2, 2012, Quicken again
solicited O'Brien to refinance his home, advertising that no
additional appraisal would be required.  Id. ¶ 50.  In June 2012,
O'Brien learned that the market value of his property in June 2009
was approximately $122,000.  Id. ¶ 51.  He alleges that Quicken
knew at the time of closing that the loan amount exceeded the value
of his home.  Id. ¶ 29.

B. Loan Servicing

Immediately after origination of the 2008 and 2009 loans,
Quicken transferred servicing to Countrywide Home Loans, which
later merged into defendant Bank of America.  Id. ¶¶ 19, 30.
Around May 2011, while current on his payment, O'Brien applied for
a loan modification to obtain a lower monthly payment.  Id. ¶¶ 31-
32.  O'Brien asked if the loan modification would negatively affect
his credit or otherwise create problems for his account, and Bank
of America assured him that it would not.  Id. ¶ 33.

On approximately June 9, 2011, Bank of America informed
O'Brien that he had been approved for a trial period plan and
instructed O'Brien that his loan would be permanently modified if

5

he made four payments of $832.52.[3]  Id. ¶ 34.  O'Brien returned the modification documents within a month.  Id.  Bank of America stated that the documents were not received, so O'Brien resubmitted the documents on approximately July 13, 2011.  Id.

As quoted in O'Brien's complaint, the trial period contract states, "If I am in compliance with this Trial Period Plan (the "Plan") . . . the Servicer will provide me with a Partial Claim and FHA-Home Affordable Modification Agreement . . . ."  Id. ¶ 36.  It also provided that upon completion of the four payments, Bank of America would apply the payments to the loan and cure the default, correcting O'Brien's credit.  Id. ¶ 37.

O'Brien made the four payments as instructed.  Id. ¶ 38. He then contacted Bank of America for an update regarding the permanent modification.  Id. ¶ 39.  He alleges that Bank of America repeatedly responded by giving conflicting information, including statements that the final documents would be mailed soon and that they had been mailed but not returned by O'Brien.  Id. ¶ 40.  Bank of America instructed O'Brien to continue making the modified payments until he received the documentation for his final modification.  Id. ¶ 42.  He never received those documents.  Id. ¶ 43.

---

[3] O'Brien's original monthly payment amount is unstated in the complaint.

O'Brien alleges that Bank of America refused to apply his payments to his account and instead reported him as delinquent to the credit reporting agencies. Id. ¶ 41. He represents that he continues to make the monthly payments, and Bank of America continues to refuse to apply the payments to his account or report him as current to the credit reporting agencies. Id. ¶ 44. In addition, Bank of America has assessed and continues to assess late fees to O'Brien's account for each month, despite his payments that he claims are timely and in the amount instructed. Id. ¶ 54. O'Brien contends that his credit has been substantially damaged as a result of Bank of America's conduct. Id. ¶ 47.

By correspondence dated April 27, 2012, Bank of America explained to O'Brien that he had not been provided the final modification documents because of delays related to the Government National Mortgage Association ("Ginnie Mae"). Id. ¶ 46. It stated that a permanent modification would be mailed to O'Brien. Id.

On May 1, 2012, O'Brien sent a letter to Bank of America requesting that all further communications be directed to counsel and requesting a detailed account record. Id. ¶ 48. A certified mail return receipt indicates that Bank of America received the letter on May 4, 2012. Bank of America nonetheless contacted O'Brien directly ten times from May 8, 2012 to June 28, 2012, eight times by phone and twice by letter. Id. ¶ 49.

O'Brien initiated this action on August 3, 2012 in the Circuit Court of Kanawha County, West Virginia against the two current defendants, Quicken and Bank of America, as well as Crowder and Ginnie Mae.  Ginnie Mae removed the case to federal court on September 6, 2012, asserting federal question jurisdiction.  Quicken, invoking this court's diversity jurisdiction, filed a separate notice of removal on September 7, 2012, that was docketed as a separate action.  The court consolidated the two cases on October 1, 2012, designating the Ginnie Mae action as the lead case.  Quicken and Bank of America filed the pending motions to dismiss on October 8, 2012 and October 9, 2012, respectively.  On October 10, 2012, in response to O'Brien's Rule 41 notice of dismissal, the court dismissed Ginnie Mae without prejudice.  On April 2, 2013, the court entered a proposed order by O'Brien that dismissed Marshall Crowder without prejudice.

O'Brien's first amended complaint, filed on September 26, 2012, alleges eleven counts.  The first three counts are alleged against Quicken and relate to the loans' origination: Count I, Unconscionable Contracts; Count II, Illegal Loan; and Count III, Fraud.  The remaining eight counts are alleged against Bank of America and relate to the servicing of the loans: Count IV, Breach of Contract; Count V, Negligence; Count VI, Misrepresentations & Unconscionable Conduct in Debt Collection; Count VII, Refusal to Apply Payments; Count VIII, Illegal Late Charges; Count X,

Estoppel; Count XI, Fraud; and Count XII, Illegal Debt Collection.
The complaint nowhere sets forth or references a Count IX, and Bank
of America's motion does not seek dismissal of Count IV or Count X.

## II. The Governing Standard

Under Federal Rule of Civil Procedure 8(a)(2), a
complaint must contain "a short and plain statement of the claim
showing that the pleader is entitled to relief."  Rule 12(b)(6)
correspondingly permits a defendant to challenge a complaint when
it "fail[s] to state a claim upon which relief can be granted."
Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide
"'fair notice of what the . . . claim is and the grounds upon which
it rests.'"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007)
(quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); see also
Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007).  "To
survive a motion to dismiss, a complaint must contain sufficient
factual matter, accepted as true, to 'state a claim to relief that
is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678
(2009) (quoting Twombly, 550 U.S. at 570); see also Monroe v. City
of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009).  Facial
plausibility exists when the court is able "to draw the reasonable
inference that the defendant is liable for the misconduct alleged."
Iqbal, 566 U.S. at 678 (quoting Twombly, 550 U.S. at 556).  The

plausibility standard "is not akin to a 'probability requirement,'" but it requires more than a "sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556).

In assessing plausibility, the court must accept as true the factual allegations contained in the complaint, but not the legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The determination is "context-specific" and requires "the reviewing court to draw on its judicial experience and common sense." Id. at 679.

III. Discussion

A.   Count I: Unconscionable Contract

Count I claims that O'Brien's loan transactions with Quicken were unconscionable. In support O'Brien alleges disparity in sophistication between himself, an unsophisticated borrower, and Quicken, a large national corporation; misrepresentations by Quicken regarding the value of his home; pressure to increase the loan amount without regard to his stated desire to merely refinance; repeated solicitations to refinance by Quicken that resulted in a still greater loan amount and additional fees; and the closing in a setting that impeded his ability to ask questions and understand the loan documents. Compl. ¶¶ 53-56. In moving to

dismiss Count I, Quicken argues that O'Brien has failed to plausibly allege both procedural and substantive unconscionability.

Section 46A-2-121 of the West Virginia Consumer Credit and Protection Act ("WVCCPA" or "the Act") provides the following instructions respecting unconscionability:

> (1) With respect to a transaction which is or gives rise to a consumer credit sale or consumer loan, if the court as a matter of law finds:
>
> > (a) The agreement or transaction to have been unconscionable at the time it was made, or to have been induced by unconscionable conduct, the court may refuse to enforce the agreement, or
> >
> > (b) Any term or part of the agreement or transaction to have been unconscionable at the time it was made, the court may refuse to enforce the agreement, or may enforce the remainder of the agreement without the unconscionable term or part, or may so limit the application of any unconscionable term or part as to avoid any unconscionable result.
>
> (2) If it is claimed or appears to the court that the agreement or transaction or any term or part thereof may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to its setting, purpose and effect to aid the court in making the determination.

W. Va. Code § 46A-2-121.

The principle of unconscionability is "the prevention of oppression and unfair surprise and not the disturbance of reasonable allocation of risks or reasonable advantage because of superior bargaining power or position."  Orlando v. Fin. One of W. Va., Inc., 179 W. Va. 447, 369 S.E.2d 882, 885 (1988) (citation omitted).  The test for unconscionability is

> whether, in the light of the background and setting of
> the market, the needs of the particular trade or case,
> and the condition of the particular parties to the
> conduct or contract, the conduct involved is, or the
> contract or clauses involved are so one sided as to be
> unconscionable under the circumstances existing at the
> time the conduct occurs or is threatened or at the time
> of the making of the contract.

Arnold v. United Cos. Lending. Corp., 204 W. Va. 229, 235, 511

S.E.2d 854, 860 (1998) (quoting Orlando, 179 W. Va. at 450, 369

S.E.2d at 885).

Courts analyze unconscionability in terms of two

component parts: procedural unconscionability and substantive

unconscionability.  Brown v. Genesis Healthcare Corp. ("Brown II"),

229 W. Va. 382, 729 S.E.2d 217, 227 (2012).  Both must be present,

but they need not be present to the same degree.  Id.  The court

applies a sliding scale in making the determination, whereby "'the

more substantively oppressive the contract term, the less evidence

of procedural unconscionability is required to come to the

conclusion that the clause is unenforceable, and vice versa.'"  Id.

(quoting Brown v. Genesis Healthcare Corp. ("Brown I"), 724 S.E.2d

250, 285 (W. Va. 2011)).

The West Virginia Supreme Court of Appeals recently

described both procedural and substantive unconscionability.

Regarding procedural unconscionability it stated,

> Procedural unconscionability is concerned with
> inequities, improprieties, or unfairness in the
> bargaining process and formation of the contract.

12

Procedural unconscionability involves a variety of
inadequacies that results in the lack of a real and
voluntary meeting of the minds of the parties,
considering all the circumstances surrounding the
transaction.  These inadequacies include, but are not
limited to, the age, literacy, or lack of sophistication
of a party; hidden or unduly complex contract terms; the
adhesive nature of the contract; and the manner and
setting in which the contract was formed, including
whether each party had a reasonable opportunity to
understand the terms of the contract.

Id. (quoting Syl. Pt. 17, Brown I, 724 S.E.2d at 261).  Substantive

unconscionability was described as follows:

Substantive unconscionability involves unfairness in the
contract itself and whether a contract term is one-sided
and will have an overly harsh effect on the
disadvantaged party. The factors to be weighed in
assessing substantive unconscionability vary with the
content of the agreement.  Generally, courts should
consider the commercial reasonableness of the contract
terms, the purpose and effect of the terms, the
allocation of the risks between the parties, and public
policy concerns.

Id. (quoting Syl. Pt. 19, Brown I, 724 S.E.2d at 262).


     This court has previously stated that

"[u]nconscionability claims should but rarely be determined based

on the pleadings alone with no opportunity for the parties to

present relevant evidence of the circumstances surrounding the

consummation of the contractual relationship."  Mallory v. Mortg.

Am., Inc., 67 F. Supp. 2d 601, 612 (S.D. W. Va. 1999) (citing

Carlson v. Gen. Motors Corp., 883 F.2d 287, 292 (4th Cir. 1989)).

"'The particular facts involved in each case are of utmost

importance since certain conduct, contracts or contractual

provisions may be unconscionable in some situations but not in others.'" Arnold, 204 W. Va. at 235, 511 S.E.2d at 860 (quoting Orlando, 179 W. Va. at 450, 369 S.E.2d at 885). Accordingly the WVCCPA emphasizes the need for discovery in assessing unconscionability claims: "If it is claimed or appears to the court that the agreement or transaction or any term or part thereof may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to its setting, purpose and effect to aid the court in making the determination." W. Va. Code § 46A-2-121.

The court finds that O'Brien has sufficiently pled unconscionability. With respect to procedural unconscionability, O'Brien has alleged that he is an unsophisticated consumer and that he did not have a reasonable opportunity to read and understand the documents given the unusual manner and setting for the closing. With respect to substantive unconscionability, he has alleged that inflated appraisals led him unwittingly to take out loans in excess of the value of his home and rendered him unable to refinance or sell his home. Taken as true, the allegations implicate the one-sidedness and public policy concerns that are the subject of substantive unconscionability. Regardless of whether these allegations can be proved so as to ultimately support a finding of unconscionability when fully developed and presented to the trier of fact, they provide a well-pled basis for the court to conclude

14

at this stage that the contract "may be unconscionable" and that dismissal is inappropriate.  W. Va. Code § 46A-2-121(2)

Contrary to Quicken's arguments, this court's unpublished decision in <u>Corder v. Countrywide Home Loans, Inc.</u>, No. 2:10-0738, 2011 WL 289343 (S.D. W. Va. January 26, 2011), does not counsel for a different result.  In <u>Corder</u> this court dismissed an unconscionability claim that rested on the bare allegation that the plaintiff was unsophisticated and the appraisal was inflated.  <u>Id.</u> at *9.  While O'Brien's reference to fifty-eight supporting facts in his response brief is doubtless an exaggeration, he has pled substantially more than was present in <u>Corder</u>.  Allegations concerning the rushed closing in McDonald's, for example, provide concrete facts that were missing from the complaint in <u>Corder</u>.  Likewise, appraisal amounts and the allegation concerning Quicken's disregard for the 2009 appraisal support O'Brien's inflated appraisal allegation.  There is no merit to Quicken's further contention that O'Brien must plead the source and methodology of his retroactive appraisal.  <u>See</u> <u>Robertson v. Sea Pines Real Estate Cos., Inc.</u>, 679 F.3d 278, 291 (4th Cir. 2012 ) (". . . <u>Iqbal</u> and <u>Twombly</u> do not require a plaintiff to prove his case in the complaint.").

The court is unpersuaded by Quicken's further arguments regarding substantive unconscionability -- that O'Brien's signature precludes an unconscionability claim and that inadequate collateral

only disadvantages the lender.  Where there is fraud or other
wrongful conduct, a signing party will not necessarily be bound by
the written instrument's terms.  See Hager v. Am. Gen. Fin., Inc.,
37 F. Supp. 2d 778, 788 (S.D. W. Va. 1999) (citing Acme Food Co. v.
Older, 61 S.E. 235, 244 (1908)).  Regarding the impact of
inadequate collateral, the complaint alleges that the inflated
appraisal deprived O'Brien of his ability to refinance the loan or
sell his home and subjected him to increased risk of foreclosure.
The complaint also alleges, by way of contrast, that Quicken was
able to eliminate its own risk through its practice of immediately
selling the loans.  Taken as true, these allegations provide
sufficient grounds from which the court can infer that the
resulting risk disproportionately rested with O'Brien.

B.    Count II: Illegal Loan

        Count II alleges that Quicken violated West Virginia Code
§ 31-17-8(m)(8) by issuing a mortgage loan in an amount exceeding
the fair market value of O'Brien's property.  The relevant
provision states as follows:

> (m) In making any primary or subordinate mortgage loan,
> no licensee may, and no primary or subordinate mortgage
> lending transaction may, contain terms which:
>
> * * *
>
> (8) Secure a primary or subordinate mortgage loan in a
> principal amount that, when added to the aggregate
> total of the outstanding principal balances of all
> other primary or subordinate mortgage loans secured by
> the same property, exceeds the fair market value of

the property on the date that the latest mortgage loan is made.

W. Va. Code § 31-17-8(m)(8).  In seeking dismissal of Count II, Quicken reiterates its argument that O'Brien has failed to adequately plead facts relating to the true value of his home.  It asserts that there can be no violation with regard to the 2008 loan because O'Brien alleges only the value of his home as of 2009.

O'Brien has sufficiently pled his illegal loan claim. The complaint sets forth the amounts of both the 2008 and 2009 loans, and it states that the true value of the home in 2009 was significantly less than either.  As discussed above with regard to Count I, O'Brien need not set forth the source and methodology for the retroactive valuation at the pleadings stage.  The adequacy of the retroactive valuation is a matter for discovery.  Additionally, O'Brien's retroactive 2009 valuation, taken as true, provides a plausible basis to infer at this stage that the 2008 loan, with its amount $17,080 greater than the retroactive 2009 valuation, exceeded the property's fair market value.

C.   Count III: Fraud

Count III claims that Quicken fraudulently represented that O'Brien's home has a value of $147,000 and that it was following "responsible and prudent lending practices."  Compl. ¶ 62.

17

The essential elements of fraud are

(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied on it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied on it.

Folio v. City of Clarksburg, 221 W. Va. 397, 404, 655 S.E.2d 143, 150 (2007) (internal quotation marks and citations omitted).  Fraud claims are subject to a two-year limitations period as set forth in West Virginia Code § 55-2-12.  Alpine Prop. Owners Ass'n, Inc. v. Mountaintop Dev. Co., 179 W. Va. 12, 21, 365 S.E.2d 57, 66 (1987).

Quicken contends that O'Brien's fraud claim is time-barred under the two-year statute of limitations.  Quicken's Mem. Supp. Mot. Dismiss 13.  It asserts that the clock began running when O'Brien received a copy of the appraisal, at the August 22, 2008 closing.  O'Brien initiated this action on August 3, 2012, significantly more than two years after that closing.  O'Brien responds that Quicken's statute of limitations argument is a factually-based affirmative defense and inappropriate for resolution at the pleadings stage.  Pl.'s Opp'n Quicken's Mot. Dismiss 16.  He argues that under the discovery rule, the limitations period should begin only after he became aware of the misrepresentation by obtaining the retrospective appraisal in June 2012.  Alternatively, O'Brien argues that insofar as he has requested equitable relief, the claims are subject to laches, not the limitations provision.  Dunn v. Rockwell, 225 W. Va. 43, 54,

18

689 S.E.2d 255, 266 (2009) ("Our law is clear that there is no statute of limitation for claims seeking equitable relief.").

Pursuant to the discovery rule, the court cannot conclude at this juncture that O'Brien's claim was untimely filed. The discovery rule provides that for tort actions "the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that [he] has been injured, (2) the identity of the entity who owed [him] a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury." Id. at 52-53, 689 S.E.2d at 265-66 (quoting Syl. Pt. 4, Gaither v. City Hosp., Inc., 199 W. Va. 706, 487 S.E.2d 901 (1997). Applying the discovery rule to the present case, the limitations period appears at this stage to begin in June 2012, when O'Brien obtained a retrospective appraisal and allegedly discovered that Quicken had misrepresented his home's appraisal value. As viewed from that date, he timely filed the action only two months later.

Quicken argues that O'Brien did not exercise reasonable diligence. That, however, is the subject of a material factual dispute whose outcome is unclear on the existing record. Legg v. Rashid, 222 W. Va. 169, 176, 663 S.E.2d 623, 630 (2008) ("While many cases will require a jury to resolve the issue of when a plaintiff discovered his or her injury, including the related issue

of whether the plaintiff was reasonably diligent in discovery of
his or her injury, the issue can also be resolved by the court
where the relevant facts are undisputed and only one conclusion may
be drawn from those facts.").

Having found that the discovery rule prevents dismissal
based on the limitations period, the court need not address
O'Brien's alternate argument regarding claims for equitable relief.

Quicken also asserts that O'Brien has failed to allege a
misrepresentation to serve as the basis for his fraud claim because
Quicken's home valuation constitutes an expression of an opinion.
Quicken's Mem. Supp. Mot. Dismiss 12.  Our court of appeals,
though, has recently held that misrepresentations concerning home
values can support fraud claims.[4]  See McCauley v. Home Loan Inv.
Bank, F.S.B., 710 F.3d 551, 559 (4th Cir. 2013) (finding no basis
for the dismissal of a fraud claim because "[a] lender that informs
a borrower about how much her property is worth, whether required
to do so or not, is under an obligation not to misrepresent that
value.").

_____

[4] Even in jurisdictions where good-faith appraisals are treated as
opinions and are immune from fraud allegations, an intentionally
inflated appraisal may still be fraudulent.  See Decatur Ventures,
LLC v. Daniel, 485 F.3d 387, 390 (7th Cir. 2007) ("[B]ecause
Indiana treats an appraisal as an opinion rather than a fact, the
representation could be fraudulent only if the appraisal's author
did not believe her own numbers.").  Here, O'Brien alleges, and the
retrospective appraisal might suggest, that Quicken was aware of
the inaccuracy.

Quicken next contends that O'Brien's reliance on Quicken's appraisal of his property is unjustified, given that Quicken conducted the appraisal for its own benefit in assuring the loan's security.  Quicken's Mem. Supp. Mot. Dismiss 13.  As discussed above with reference to Count I, O'Brien has sufficiently demonstrated that an accurate appraisal was in his own interest and that he had reason to rely on Quicken's representation.  See McCauley, 710 F.3d 551, 559 (finding the plaintiff to have alleged justifiable reliance on the lender's valuation of her property).  Quicken's alleged misrepresentations of the appraisal value to O'Brien can constitute fraud.

E.   Counts V and XI: Common Law Negligence and Fraud Claims

Counts V and XI assert, respectively, common law negligence and fraud claims arising from Bank of America's servicing of O'Brien's loans.  In seeking to dismiss these claims, Bank of America argues that common law claims must arise out of a special duty separate from the duties the WVCCPA imposes.  Bank of America's Mem. Supp. Mot. Dismiss 5.  It contends that the negligence and fraud claims are duplicative of O'Brien's WVCCPA claims and allege no such special duty.  Id.

"The West Virginia Consumer Credit and Protection Act does not preclude claims brought at common law against assignees, holder, or lenders."  Casillas v. Tuscarora Land Co., 186 W. Va.

21

391, 394, 412 S.E.2d 792, 795 (1991).  "[A] common law action of fraud may be maintained against a lender, assignee, or holder where direct allegations of fraud or misrepresentation exist separate from the Act."  Id. at 394, 412 S.E.2d at 795.  This district has interpreted Casillas to require only that the common law claim be capable of existing independently from the Act.  See, e.g., Pemberton v. U.S. Bank, No. 5:11-cv-0630, 2012 WL 37113, at *2-*3 (S.D. W. Va. January 5, 2012) (rejecting the defendant's position that "Casillas stands for the proposition that Plaintiff's claims must be factually separable from the statutory claims that arise under the WVCCPA.").  Contrary to Bank of America's assertion, a plaintiff can allege WVCCPA and common law claims arising from the same or similar facts.  The question then is whether Counts V and XI adequately plead claims for common law negligence and fraud.

To prevail in a negligence suit, a plaintiff must demonstrate by a preponderance of the evidence that the defendant owed to the plaintiff a legal duty whose breaching proximately caused the plaintiff's injury.  Strahin v. Cleavenger, 216 W. Va. 175, 603 S.E.2d 197, 205 (2004).  Whether a defendant in a particular case owes a duty to the plaintiff "is not a factual question for the jury," but rather is a determination that "must be rendered by the court as a matter of law."  Syl. Pt. 5, Aikens v. Debow, 208 W. Va. 486, 489, 541 S.E.2d 576, 579 (2000).

22

Under West Virginia law, a plaintiff "cannot maintain an action in tort for an alleged breach of a contractual duty." Lockhart v. Airco Heating & Cooling, 211 W. Va. 609, 614, 567 S.E.2d 619, 624 (2002). A legal duty, however, may arise from a special relationship between the parties. Glascock v. City Nat'l Bank of W. Va., 213 W. Va. 61, 66, 576 S.E.2d 540, 545 (2002). "The existence of a special relationship will be determined largely by the extent to which the particular plaintiff is affected differently from society in general." Id. at 66, 576 S.E.2d at 545.

In the lender-borrower context, a special relationship may exist where a lender performs services not normally provided by a lender to a borrower. See id. at 67, 576 S.E.2d at 546 ("[W]here a lender making a construction loan to a borrower creates a special relationship with the borrower by maintaining oversight of, or intervening in, the construction process, that relationship brings with it a duty to disclose any information that would be critical to the integrity of the construction project."). The possession of information unique to the lender can also indicate a special relationship. See id. (finding a special relationship where "the bank possessed information of no interest to 'society in general,' but of great interest to the [plaintiffs]").

O'Brien has failed to allege facts indicating that Bank of America owed to him a legal duty that could support a common law

negligence claim.   The relationship O'Brien outlines in his
complaint, including during the loan modification process, is
customary of that of a borrower and lender, as is any duty to
provide accurate information during the loan modification process.
The complaint does not allege that Bank of America endeavored to
perform uncustomary services or possessed information of unique
relevance to O'Brien.   In the absence of a special relationship,
O'Brien has alleged no duty apart from the WVCCPA.   Claims stemming
from the violation of those duties do not sound in tort, and Count
V fails to state a cognizable negligence claim.

        As stated above with regard to Count II, a prima facie
claim of common law fraud requires a showing

> (1) that the act claimed to be fraudulent was the act of
> the defendant or induced by him; (2) that it was material
> and false; that plaintiff relied on it and was justified
> under the circumstances in relying upon it; and (3) that
> he was damaged because he relied on it.

Folio, 221 W. Va. at 404, 655 S.E.2d at 150 (internal quotation
marks and citations omitted).   Count XI alleges that Bank of
America represented that the loan modification process would not
adversely affect his credit; that the representation was false;
that he justifiably began making modified payments; and that Bank
of America, by reporting him to credit bureaus, has damaged his
credit.   Compl. ¶¶ 98-104.   These allegations adequately state a
prima facie case for common law fraud, irrespective of the WVCCPA.

F.   Counts VI, VII, VIII, and XII: WVCCPA Claims

Count VI, VII, VIII and XII set forth WVCCPA claims against Bank of America related to its servicing of O'Brien's loan. Bank of America seeks to dismiss each of these counts on the ground that the "bare and conclusory allegations" do not meet the pleading requirements of Rule 8(a) and 12(b)(6).  Bank of America's Mem. Supp. Mot. Dismiss 8.  Specifically, Bank of America asserts that O'Brien sets forth no factual basis for the WVCCPA claims.  It further asserts that the illegal debt collection claim in Count XII fails because O'Brien has not adequately alleged that Bank of America was engaged in debt collection activities.

Bank of America's motion does not highlight any specific deficiencies in O'Brien's factual pleadings regarding the WVCCPA counts, and the court does not find any now.  Regarding Count VI (misrepresentations and unconscionable conduct), alleged misrepresentations concerning O'Brien's qualification for loan modification and the lack of harm to his credit state a plausible violation of West Virginia Code § 46A-2-127, and the allegations that O'Brien timely made modified payments support an asserted violation of § 46A-2-124(c), concerning false reporting of delinquency.  Counts VII (refusal to apply payments) and VIII (illegal late charges) are adequately supported by allegations that Bank of America did not apply O'Brien's modified payments as promised and assessed late charges.  Compl. ¶¶ 37, 41, 45.

Allegations that O'Brien informed Bank of America by letter that he was represented by counsel and that Bank of America nonetheless continued to contact him directly plausibly support Count XII (illegal debt collection). Finally, Bank of America's assertion that O'Brien failed to demonstrate that it was involved in debt collection activities has no merit.[5] The complaint is replete with references to Bank of America's debt collection activities, including collecting payments, assessing late fees, and reporting O'Brien to credit agencies. The court concludes that O'Brien has adequately pled his WVCCPA claims.

IV.

Based upon the foregoing discussion, it is, accordingly, ORDERED as follows:

1. that Quicken's motion to dismiss, filed October 8, 2012, be, and it hereby is, denied; and

2. that Bank of America's motion to dismiss, filed October 9, 2012, be, and hereby is, granted as to Count V and otherwise denied.

---

[5] Bank of America relies on the unpublished and distinguishable decision in Spoor v. PHH Mortg. Corp., 2011 U.S. Dist. LEXIS 24952 (N.D. W. Va. March 11, 2011), for the argument that loan modification is not a debt collection activity. Whereas Spoor concerned the lender's evaluation and denial of a loan modification request, see id. at *22, this case involves debt collection activities under an allegedly agreed loan modification.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER:    May 28, 2013

John T. Copenhaver, Jr.
United States District Judge